ANDERSON et al. v. CROW et al.

No. 10173.

Court of Civil Appeals of Texas. Austin.

July 15, 1953.

Rehearing Denied July 31, 1953.

John F. Onion, Jr., Asst. Dist. Atty., Dobbins & Howard, William P. Dobbins and Van H. Howard, Jr., San Antonio, for appellants.

Lang, Byrd, Cross & Ladon, Keith L. Brown, San Antonio, for appellees.

HUGHES, Justice.

R. B. Crow, Joe Kravitz and John Hudek, qualified resident electors owning taxable property in the East Central Rural High School District No. 20 of Bexar County and otherwise fully qualified to vote in bond elections held in such district in this proceeding contest an election held therein on December 6, 1952, in which the issuance of $350,100 school improvement bonds and the levy of a tax for the purpose of retiring such bonds was authorized by a vote of 227 to 180.

Contestees are the Hon. Austin F. Anderson, Criminal District Attorney of Bexar County, Johnny Dudek, Jr., Arthur J. Schaefer, Ted R. Burkhardt, Richard Koehler, Erwin W. Janszen, Hilmer Voges and J. H. Champagne, the duly qualified and acting Trustees of the school district named above.

Contestants' sole ground of contest is that only one voting place was provided within the district for holding the election, it being alleged in this regard: "That the action of the Board of Trustees of said school district and the managers and officers of said election in providing only one polling place for the holding of said election was contrary to the Constitution and laws of the State of Texas and deprived a sufficient number of qualified resident property taxpaying voters of said school district of their vote who, if having been given the opportunity to vote in the election precinct of their residence, would have voted against the above proposition, to have caused such proposition to be defeated."

The trial court made and filed the following findings of fact and conclusions of law:

"Findings of Fact

"1. I find that East Central Rural High School District No. 20 encompasses the whole of 4 and parts of 8 voting precincts established by the Commissioners Court of Bexar County, Texas.

"2. I find that since the formation of Rural High School District No. 20 and prior to December 6, 1952, there had been two other School Bond Elections in this Rural High School District and in both of said elections polling places were established in substantially all of the voting precincts designated by the County Commissioners Court of Bexar County, Texas.

"3. I find that in the School Bond election held December 6, 1952, only one voting or polling place was established, towit, the East Central High School at the intersection of Stuart and Sulphur Springs Road in Voting Precinct No. 112, wherein the residents and qualified voters of all other precincts could cast their ballots.

"4. I find that East Central Rural High School District No. 20 takes in an area of from 260 to 320 square miles of territory in which lie numerous small rural communities connected with each other largely by dirt, gravel, and unpaved circuitous roads.

"5. I find that the established polling place at the East Central Rural High School was in distance from 5 to 22 miles from the homes and customary polling places of an overwhelming majority of the qualified voters, whereas the customary voting places were in distance from 1 block to not over 5 miles from the voters' residences.

"6. I find that a substantial number of qualified voters in East Central Rural High School District No. 20 are aged people over 60 years of age.

"7. I find that the Trustees of East Central Rural High School District No. 20, before deciding to hold said bond election, were advised by their legal counsel that they would be taking a calculated risk as to the legality of the election in so holding the same in one voting precinct, and that said Trustees, after considerable deliberation, decided to hold said election with a full knowledge of such risk.

"8. I find that the designation of only one polling place for residents of the District to cast their votes was under all of the circumstances calcu-

lated to and did disenfranchise a large number of qualified voters.

"9. I find that if the right to vote had not been limited to one voting place more than a sufficient number of qualified voters would have voted on December 6, 1952 and would have voted against the issuance of the bonds to have materially changed the result of the election.

"10. I find that if the right to vote had not been limited to one voting place more than a sufficient number of qualified voters would have voted on December 6, 1952 and would have voted against the issuance of the bonds to have defeated the proposition for the issuance of bonds.

"11. I find that the proposition in favor of the issuance of the bonds would have failed to carry but for the fact that many qualified voters were deprived of the opportunity to cast their ballots in the usual and customary voting places in the precincts of their respective residences; and that a great number of the persons so deprived would have voted against the issuance of said bonds had they not been so deprived of their privilege of voting, and that the persons that would have so voted against the issuance of said bonds were sufficient in number to have caused the proposition in favor of the issuance of said bonds to fail.

"12. That the action of the Board of Trustees of East Central Rural High School District No. 20 in establishing but one voting place on December 6, 1952 was arbitrary and capricious under the circumstances whether or not the said Board was legally required to establish voting places in the precincts designated by the County Commissioner's Court or had the right to establish precincts within the boundaries of the entire School District, and such action resulted in disenfranchising a sufficient number of qualified voters to have materially changed the result of the election.

"Conclusions of Law

"1. I conclude that the proposition of the issuance of the bonds submitted to the voters of East Central Rural High School District No. 20 failed to carry.

"2. I conclude that the election held on December 6, 1952 at the East Central Rural High School was and is void."

Judgment appropriate to such findings and conclusions was entered.

The statement of facts herein contains 641 pages all of which we have carefully read and in which we find no disputed material issue of fact.

■ We find no evidence to support finding 8 of the trial court to the effect that the designation of only one voting place was calculated to and did disfranchise a large number of qualified voters.

■ We further find no evidence to support finding 12 of the trial court to the effect that the action of the School Board in establishing but one voting place was arbitrary and capricious and that such action resulted in disfranchising a sufficient number of qualified voters to have materially changed the result of the election.

The record shows that two previous bond elections had been held in District 20, the first on May 20, 1950, in which 411 votes were cast and the second on April 26, 1952, in which 440 votes were cast. The number of votes cast in this election was 407.

In each of the previous bond elections ten voting places were established.

In two previous trustee elections held in the school district in 1951 and 1952, only one voting precinct was established for the entire district. In the 1952 trustee election 326 votes were cast.

No voting places have ever been established for either bond or trustee elections held in the district in Commissioners Precincts Nos. 110, 127, 108, 107 & 114, all of which lay only partly within the school district. The usual voting places in at least some of these precincts was outside the boundaries of the school district.

Several members of the Board of Trustees including its member secretary, Mr. Joseph H. Champagne, testified. The substance of their unimpeached testimony was that the decision to hold the election at only one voting place was based upon these factors: The Board was aware that other independent school districts and other rural high school districts in Bexar County had in their elections consolidated their various precincts by establishing only one voting box. The Board was advised and urged by Mr. Clyde E. Smith, Bexar County School Superintendent, to adopt the same practice.

The Board was also advised that there was some question of the legality of an election in Bexar County conducted without the use of voting machines. The cost of providing these machines would be about $50 per box or about $600 if boxes were established in all 12 Commissioner's precincts. The Board was very short on maintenance funds from which the expenses of elections are paid and was most desirous of economizing. This seems to have been the most important factor entering into the Board's decision.

The third factor which may have influenced the Board in this matter was the thought expressed by some members that if the elections were held at the new high school building it would bring many voters to the building who had never seen it and having seen it they would better appreciate the manner in which their school tax money was being spent; also that it would bring the people of the district together with the result that they would become better acquainted and more tolerant of each other's views.

The single box was established by the Board at the new high school building. Its location is, for practical purposes, in the center of the district.

While the trial court found that numerous small rural communities in the district were connected with each other "largely by dirt, gravel and unpaved circuitous roads" there is no evidence that the roads leading to the high school are any worse than other roads in the district or that the roads in the district are any worse than in any other rural Texas community.

We also call attention to the fact that the high school is located nearer boxes which had previously voted heavily against this bond issue than to those boxes which had theretofore voted favorably. In other words those most discommoded by the establishment of a single voting place were the friends of the bonds and not their enemies.

In the sense that "arbitrary" means unfair or unreasonable or that "capricious" means whimsical or lack of motivation, as we presume the trial court used these words in its findings, we find all the evidence diametrically opposed to the conclusion of the trial court that the Board acted in a capricious or arbitrary manner in holding the election at the high school and at no other place.

The reasons assigned by the Board speak for themselves and we need not dwell on the obvious. Certain it is that those witnesses who testified in this case that their opposition to the issuance of these bonds was based on the fact that taxes are already too high should be the last to complain of reasonable efforts of the Board to conserve funds raised by taxation.

Let us now examine, in the light of the record, the findings of the trial court that voters of a sufficient number to have altered the result of the election were disfranchised.

Of the qualified voters who appeared as witnesses [1] thirty-seven testified uniformly

1. Joe Rakowitz and his wife; Mr. and Mrs. Max Schwenn; Phillip F. Cellmer and his wife; Felix Stanush; Victor Stanush; Otto Schmoekel; Susie Golla; Katie Golla; Dominik Ramzinski; Josephine Ramzinski; Harry Voges; Alvin Gutz; Mrs. C. Wahne; Peter Jonietz; Mrs. Regina Aniol; Pete Aniol; Willie Zunker; Peter Drzymalla; Willie Barth-old; Frank Mikoloyczyk; Peter Stanush; Hilmar Fey; Mrs. Gustana Krueger; Marshall Kosub; Felix Kalka; Joe Franckowiak; Albert Pape, Sr.; Henry Pierdolla; Mrs. Emma Pierdolla; Harry Brietzke; David Loeffler; Mike Mikolyczyk; Mrs. Etta Mae Klug; Paul Klug.

and in substance that they knew about the election and where it was to be held but they did not vote because no voting place was established where they customarily voted or that no voting place was established in "their precinct," but if they had voted they would have voted against the bonds.

Five voter witnesses [2] testified, in substance, that they did not vote because no election was held at their usual voting boxes and they did not know they were supposed to vote at the high school, some even going to their boxes for the purpose of voting. They, too, would have voted against the bonds.

Twenty-one voter witnesses gave miscellaneous reasons for not voting.[3] These witnesses would have voted against the bonds.

To disfranchise a voter is to deprive or dispossess him of the privilege of voting. The thirty-seven voters who refused to vote were neither deprived nor dispossessed of

2. Richard Weichold; Gilbert Kosub; Mathew Kusmierz; Oscar Rammler; George Padelecki.

3. Stanley Krueger failed to vote stating that he came by his old voting place at China Grove School on election day and found no box open. This witness had read the election notice but paid no attention to where it stated the election was to be held.

Carl Krueger failed to vote because his wife was sick and he had not heard of the election.

Mrs. Pelagia Kiolbassa failed to vote because her usual voting box was not open. She knew the election was being held at the high school but would not go there to vote since it was not her box and she thought it too far.

Louis Rappmund did not vote because he did not know there was to be an election.

Henry Strey, Jr. did not vote because he butchered that day and "it was just entirely too far (17 or 18 miles) to go," although he could have gone if he had not butchered.

Joe F. Strzelczyk did not vote because there was no election at his usual box. He had heard of the election but did not know it was to be held only at the high school but he would not have voted there had he known.

Earl Uecker did not vote because he did not know where to vote. He did not know the election was to be held at the high school but would not have voted there had he known.

Clarence Uecker went by his regular voting place and finding no one there did not vote. He had heard of the election but not where it was to be held. He would not have voted at any place except his usual box.

Mrs. Stella Wildman did not vote because there was no election at her usual voting place. She did not remember whether she knew this election was to be held.

Ida Tudyk did not vote because she was sick but stated if the election had been at her box she would have voted.

Mrs. Ernst Lieck did not remember about the election.

Phillip Dylla did not vote because while she had heard about the election she forgot it since the election was not to be held at her usual voting place. She would vote at no other place.

Alex Mihalski, Jr. did not vote because he took his family to the dentist at Seguin on election day getting back late and he "wasn't going to drive eleven miles to vote." He would have voted at his regular box, however, and at no other place.

Anton Ott did not vote because he did not have time to go to the school to vote but would have voted at his regular box.

John W. Burrow did not vote because the voting place was "too far from my district and I couldn't get over there." The distance was about 8 to 11 miles.

Mrs. Sophe Kosub did not vote because "it was too far from me." The distance was about 15 miles.

John Kotsur went to his usual voting place to vote but finding no one there returned home. He did not know the election was to be at the high school but would not have voted there if he had known.

Harry Kosub did not vote because he didn't have time to go to the high school where the election was held.

Mrs. Thekla Gerth did not vote because "it was too far" and she wouldn't vote outside her district.

Otto L. Wesch did not vote saying "Well, that day I didn't feel so very good. My son went there. He voted for it, but I didn't go along. But if they had had that other poll open where it was close by, I would have went over there and voted against it. * * * I didn't feel so good otherwise I would have went along with my son."

the privilege of voting by any other person nor were they prevented from voting from any cause except their own recalcitrance. If they have been disfranchised they and they alone must bear the responsibility.

We can understand, but not commend, the natural inclinations of many people to resist departure from accustomed habits, but without change there is no progress and without progress the political and economic life of this nation would soon stagnate.

Some of the witnesses here have been voting at the same box for more than forty years. If these witnesses would but recall the change in transportation facilities during those forty years we are sure they would be the first to agree that injured feelings is their only real complaint arising from consolidation of the voting boxes.

We believe it to be sound law as well as a sound governmental principle that the result of elections should be determined by the votes of those who participate in them rather than by belated preferences expressed by those who could have but refused to participate.

Waters v. Gunn, Tex.Civ.App., 218 S.W. 2d 235, 236, (Amarillo, writ ref., n. r. e.) was a contest of a school bond election in which only one voting place was provided although the district contained several election precincts established in the county by the Commissioner's Court. We quote from that opinion:

"Appellants alleged that, if voting boxes had been provided in the election precincts of the district so that the electors could have voted in the election precincts of their respective residences, as provided by Art. 2955a, Vernon's Revised Civil Statutes, there would have been a sufficient number of additional votes cast against the bond issue to have defeated the proposition. However, they failed to establish this

allegation by the evidence. We have carefully examined the entire statement of facts and, out of the twenty-two witnesses produced by appellants who testified concerning that matter, only four of them testified that they did not vote at the election because of the distance from their homes to Brownfield and, that, if they had voted, they would have voted against the issuance of the bonds. It is well established by many decisions of the courts of this state that failures and irregularities in the observance of provisions of the statutes concerning such matters as this will not invalidate an election unless they have affected or changed the result from that which the returns show it to have been."

■ Since there is no evidence that any of the thirty-seven voters under discussion were prevented from voting at the high school it is our opinion that the establishment of only one voting place is at most an irregularity which did not affect the result of the election.

We need not discuss the remaining twenty-seven voters as they are insufficient in number to change the outcome of the election.

We are further of the opinion that the Board of Trustees was clearly within its statutory authority in establishing but one voting place within the school district. This statutory authority is conferred by art. 2788, V.A.C.S.[4] which provides, in part, that "The board of trustees shall at the same time fix the polling places for holding such election * * *."

Contestants say, however, that the constitutional provision that in bond elections "all electors shall vote in the election precinct of their residence",[5] has, insofar as the term "election precinct" is concerned, been determined by the Legislature to mean only those election precincts created by Com-

---

Mrs. Lois Boldt did not vote. She said if there had been a box at her usual voting place "I think I would have made it over there."

4. This article relates to bond elections in independent school districts but it is applicable to similar elections in Rural

High School Districts. Landrum v. Centennial Rural High School Dist. No. 2, Tex.Civ.App., 134 S.W.2d 353 (Austin, writ dism. C.J.).

5. Art. 6, § 3a, Texas Constitution, Vernon's Ann.St. The Texas Election Code, Art. 2.06, V.A.T.S., similarly provides

missioner's Courts under arts. 2.04 and 2.05 of the Election Code unless the Legislature has specifically provided to the contrary.

The Constitution does not define an election precinct nor provide for their creation. See Hogg v. Campbell, Tex.Civ.App., 48 S. W.2d 515 (El Paso).

The Legislature, however, has made numerous provisions for the creation of "election precincts."

Arts. 2.04 and 2.05 of the Code give authority to the County Commissioner's Court to divide the county into election precincts and to establish election precincts in cities and towns within the county.[6]

. Other instances in which the Legislature has provided for the creation of election precincts are:

Art. 7631, V.A.C.S., provides that the Commissioner's Court shall divide proposed water improvement districts into "one or more election precincts".

Art. 7880–27, V.A.C.S., provides that as to elections held in established water improvement districts that "The directors shall name the polling places and if more than one is required divide the district into election precincts."

Art. 8001, V.A.C.S., provides, in part, that "each and every levee improvement district is hereby constituted an election precinct * * *." See also art. 7880–38a, § 3, V.A.C.S.

The statutes relating to elections in school affairs are rather heterogeneous and while we have not fully analyzed all of the numerous enactments on this subject we have found, generally speaking, that when the election is county-wide the statute usually requires the election to be held in each "Commissioners' precinct", art. 2702, V.A. C.S., or at the "regular polling places within the county", arts. 2702–A, § 3, 2744e, 2744e–1, 2744e–2, V.A.C.S., or at "the usual voting place in each election precinct in said county", art. 2744b, V.A.C.S. See also arts. 2744e–3, 2744e–4, 2744e–5, 2744e–6,

and 2784f, V.A.C.S., and art. 2790e which provide for polling places in each school district or part of school district in the county.

Where, however, the elections are within school districts not county-wide we find that "The Board of Trustees * * * shall give notice of the time and place where such election will be held * * *," art. 2746, V.A.C.S., see also art. 2776 and art. 2788 here involved, or "Such order of elections by said county judge shall * * * designate the place or places at which said elections shall be held in said common school district proposed to be so incorporated * * *", Art. 2757, see also art. 2758, V. A.C.S., or "at the usual voting places within such district", art. 2759, V.A.C.S., see also art. 2767, or if the election district is a city or town "to be conducted as other municipal elections", art. 2769, see also 2783b, 2783c, 2783d.

The Legislature, so it seems to us, has clearly and reasonably differentiated between the use of Commissioner's Courts precincts as election precincts in county-wide elections and their use for such purposes in political subdivisions containing less than a county. To adopt the interpretation advocated by contestants would, as this record reflects, lead to very awkward results.

The election here would have to be held in twelve Commissioner's precincts in some of which the usual voting places lay outside the boundaries of the district, and this for the purpose of casting an average vote of about four hundred. Much more explicit legislative language would be required to impose such burdensome election machinery upon school districts when other similar quasi-public corporations are not so hampered.

It is our opinion that District No. 20 constituted, within itself, a single election precinct. An election precinct is nothing more than a division of a town,

---

that "All voters shall vote in the election precinct in which they reside", and section 2.03 of the Code provides, in part, that all elections general, special or primary shall be held in some public building, if practicable, "within the limits of the election precinct in which such election is being held."

6. See also art. 2.02 of the Code.

county or other political or public entities for election purposes. A school district is such an entity. Absent any statute providing for the division of the district into smaller precincts the whole district is necessarily the precinct. The words "precinct" and "district" are often used interchangeably in election law. 33 Words and Phrases, Precinct, p. 253.

Our conclusion in this regard is directly supported by the opinion of the Court of Civil Appeals in Parks v. West, Tex.Civ. App., 108 S.W. 466, 470, reversed on other grounds, 102 Tex. 11, 111 S.W. 726, 113 S. W. 529, and we quote its highly persuasive language:

"Nor do we subscribe to the proposition of appellants to the effect that the people living in the Navarro and Ellis county portions of the district could not legally vote at Mertens in Hill county, because of that provision of the Constitution which requires the voter to vote in the precinct of his residence, and hence the incorporation of the Mertens district was invalid or not binding upon appellants. As has been seen, the county judge of Hill county was authorized under the act of 1901 to order the election for the incorporation of the Mertens independent school district, and by the provisions of that act had the authority to include portions of Navarro and Ellis counties in the order. There is no provision of the Constitution which expressly prohibits the Legislature from providing that the defined territory for incorporation, or when incorporated into an independent school district, which embraces portions of two or more counties, shall constitute an election precinct for the purpose of the election to incorporate and thereafter for all elections held for school purposes; and in the absence of an express provision in the statute, authorizing such districts, to that effect, we think it will be implied from the very nature of the case that it was so intended. We are therefore of the opinion that, for the purpose of determining whether any given territory shall be incorporated as an independent school district, such territory legally constitutes a residence voting precinct, for that purpose, for all the qualified voters residing within the boundaries of such territory, and if incorporated thereafter for the purpose of voting on all questions affecting the interest of the public schools."

The Attorney General has likewise adopted this view. Atty.Gen.Op. No. 0–1303, Sept. 1, 1939.

The conclusions reached on the questions discussed, stated above, make unnecessary any decision regarding the effect of a validating Act passed by the Legislature, approved and effective February 23, 1953, and found in C. 9, p. 14, Acts of 53rd Leg., Reg. Sess.

The election involved being valid and contestants having failed to sustain the grounds of their contest the judgment of the trial court is reversed and judgment is here rendered that contestants take nothing by their contest.

Reversed and rendered.